# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **CALVIN LONDO** | **CIVIL ACTION NO. 05-0417** |
| **VS.** | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE METHVIN** |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **AFFIRMED.**

### *Background*

Born on July 1, 1958, Calvin Londo ("Londo") is a 47-year-old claimant with an eighth-grade education. (Tr. 44, 162). London has worked in the past as a clerk in a hardware store. (Tr. 641).

On June 25, 1998, Londo filed an application for supplemental security income benefits, alleging disability as of April 1997 due to seizures caused by brain surgery.[1] (Tr. 116-36). That application was denied initially, and following a hearing on June 8, 1999, an ALJ issued an unfavorable decision on June 16, 2000. (Tr. 22-32). On August 7, 2000, claimant's counsel requested review by the Appeals Council, and specifically requested a copy of the hearing tape. (Tr. 18). On July 11, 2002, a copy of the hearing tape was sent to counsel, however, the tape was

---

[1] This was Londo's second application for benefits. Londo filed his first application on July 1, 1994, for supplemental security income benefits and disability insurance benefits. On January 23, 1997, an ALJ rendered an unfavorable decision. (Tr. 77-88). Londo did not seek review with the Appeals Council.

inaudible. (Tr. 17). Counsel requested either an audible copy of the hearing tape or a transcript, noting that if the Appeals Council could not provide a workable copy of the hearing tape, Londo's claim should be remanded. (Tr. 377-84). On two subsequent occasions – September 2, 2002 and December 9, 2002 – counsel was forwarded inaudible hearing tapes. (Tr. 13, 16). The Appeals Council denied Londo's request for review on March 7, 2003. (Tr. 5-7).

On April 24, 2003, Londo filed suit in this court.[2] On December 18, 2003, the Commissioner filed an unopposed motion to remand, acknowledging that the hearing tape was inaudible in at least 75 instances over 26 pages of testimony and that the case should be reheard. (Tr. 40-76). On December 23, 2003, Magistrate Judge Hill reversed and remanded the case under the fourth sentence of 42 U.S.C. §405(g) as the Commissioner requested. (Tr. 654). On February 4, 2004, the Appeals Council issued an order of remand instructing the ALJ to evaluate Londo's seizure disorder under Listing 11.03, to complete the record caused by the inaudible hearing tapes, and to resolve an issue concerning an un-adjudicated period of Title II disability from January 24, 1997 through December 31, 1997. Following a remand hearing on November 3, 2004, the ALJ issued an unfavorable decision on December 21, 2004. (Tr. 637-47). On March 7, 2005, Londo filed suit in this court.

### *Assignment of Errors*

Londo raises the following errors on appeal: (1) the ALJ failed to properly evaluate Londo's seizure disorder under Listing 11.03; and (2) the ALJ erred in assessing Londo's residual functional capacity.

---

[2] See <u>Londo v. Commissioner of Social Security</u>, Civil Action No. 03-0744, assigned to Judge Haik and Magistrate Judge Hill.

*Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

*Analysis*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.      If a person can still perform his past work, he is not disabled.

5.      If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that Londo suffers from the severe impairments of epilepsy and a history of craniotomy, but that he nevertheless retains the residual functional capacity to perform a significant range of light work and is, therefore, not disabled. (Tr. 645).

After careful consideration of the record, the undersigned concludes that the ALJ's decision is supported by substantial evidence.

## 1.      Medical History

Londo reports a history of seizures since 1980 when he was struck on the head with a blunt object. (Tr. 248). Londo re-injured his head on April 10, 1997 when he fell off a bicycle, fracturing his skull. On the same date, Londo underwent a left frontotemporal parietal craniotomy with clot evacuation. (Tr. 406-08). Following the surgery, Londo reported residual left side weakness, but Dr. Jay Howington, his attending physician, was unable to elicit any weakness on examination. On April 18, 1997, Londo was oriented and had no aphasia. He had left facial weakness, 5/5 motor strength of the right upper extremity, and 3+ or 4- motor strength of the left upper extremity. Londo's sensation was intact. (Tr. 621).

On November 10, 1997, Londo went to the emergency room at Iberia Medical Center following a seizure. There, he reported that he had missed his recent doses of anti-seizure medication. (Tr. 333). On March 9, 1998, June 15, 1998, and August 5, 1998, Londo went to

the Iberia Medical Center emergency room shortly after having seizures. Each time, he reported that he had had alcohol prior to the seizure. (Tr. 313, 316, and 325).

At the request of Disability Determinations Services, Londo was examined by Dr. Steven J. Snatic, a neurologist, on September 14, 1998. Dr. Snatic diagnosed Londo with seizure disorder, noting that he cannot climb, balance, drive or operate dangerous equipment, work at unprotected heights, work over water, or work in any sort of dangerous work environment. (Tr. 296). Otherwise, Dr. Snatic reported that Londo's neurological examination was normal and he has no additional restrictions because of of any neurological disability. (Id.) Dr. Snatic stated: "He appears to have no significant neurological deficit and appears to have normal use of the left hand, no motor weakness, no gait disturbance, and requires no assistive device to walk." (Id.). On the date of his evaluation by Dr. Snatic, Londo's Dilantin level was 11.6 µg/mL, which is within therapeutic range. (Tr. 297).[3]

On January 4, 1999, Londo was evaluated at University Medical Center in Lafayette, Louisiana for seizures, reporting that he had had one seizure in the past month. Progress notes indicate that Londo had been prescribed 100 mg of Dilantin, and that he had had alcohol the previous weekend. (Tr. 354). Blood levels taken the following day showed a Dilantin level of 6.9 µg/mL and a Phenobarbital level of 11.16 µg/mL, both of which are considered below normal. (Tr. 355). Londo was seen again at UMC on February 17, 1999 following a seizure. (Tr. 344). At that time, Londo's Dilantin level was 39.2 µg/mL, which is above normal. (Tr.

---

[3] Therapeutic levels for Dilantin are between 10-20 µg/mL, while therapeutic levels of phenobarbital are between 15-40 µg/mL. See Stedman's Medical Dictionary, 16th Ed. p. 2005-06. Dilantin blood levels that are too high can cause seizures, while subtherapeutic levels are an indication either that the patient is not taking his medication as prescribed or is improperly metabolizing the medication.

345).  On February 26, 1999, Londo was seen at UMC in Lafayette following a seizure.  (Tr. 338).  His Dilantin level at that time was 27.0 11.16 µg/mL, which is above normal.  (Tr. 341).

 On May 31, 1999, Londo was seen at Iberia Medical Center's emergency room for a seizure that occurred just prior to his arrival at the hospital.  (Tr. 374-75).  Progress notes show that while Londo's Dilantin and Phenobarbital levels were within normal levels (15 µg/mL and 17 µg/mL, respectively), Londo admitted to recent alcohol usage.  (Id.).  On June 24, 2000, Londo had a focal seizure and again was taken to Iberia Medical Center, where he had a grand mal seizure in the hospital.  At the hospital, Londo reported that he had missed recent seizure medication doses and admitted using alcohol.  (Tr. 390).

Over the next several years, Londo was treated for seizures following either failures to take his seizure medication or periods of alcohol usage.  The following instances are documented in the record:

- July 5, 1999 - drank beer the day before a seizure (Tr. 393);

- August 20, 1999 - treated at Iberia Medical Center for "alcohol intoxication" (Tr. 394);

- November 24, 1999 - progress notes indicate that Londo overdosed on Dilantin prior to a seizure) (Tr. 395);

- April 17, 2000- progress notes state that Londo admitted not taking his anti-seizure medication prior to a seizure (Tr. 397);

- June 24, 2000 - recent alcohol intake (Tr. 782);

- July 29, 2000 - recent alcohol intake and "alcohol intoxication." (Tr. 778-79);

- August 29, 2000 - recent alcohol intake (Tr. 769).

The record shows that Londo was repeatedly advised by his doctors not to drink alcohol.  (Tr. 274; 370; 372).

At the request of Disability Determinations Services, Londo was examined by Dr. John Canterbury, an internist, on May 15, 2004. At that time, Londo reported that he could perform most activities of daily living, that he had seizures about once a month, and that he was compliant with his medication regime. (Tr. 834). Dr. Canterbury reported that Londo had a very minor left-sided limp that did not require an assistance device; he was able to get up from a chair with no problems; grip strength was 5/5 on the right and left sides; fine and gross manipulation was intact; he had full range of motion in all joints; motor strength was 5/5 in the upper and lower extremities; and there were no signs of left-sided weakness. (Tr. 833-35). Dr. Canterbury reported that Londo can lift moderately heavy objects. (Tr. 835). In a Medical Source Statement completed in connection with his examination of Londo, Dr. Canterbury reported that Londo has no limitations in the areas of lifting, carrying, sitting, and pushing, he can stand/walk for six hours in an 8-hour workday, he can frequently kneel, crouch, and crawl, and he has no manipulative, visual/communicative, or environmental limitations. (Tr. 836-38).

An EKG conducted on August 27, 2004 showed an abnormal result with reduced voltage activity in the left hemisphere. (Tr. 856).

## II.    Listing 11.03

Londo contends that the ALJ failed to properly evaluate his seizure disorder under Listing 11.03. Londo acknowledges that he does not precisely satisfy the requirements of Listing 11.03, because he does not have seizures that occur more frequently that once weekly. Nevertheless, Londo contends that *when* he has seizures, he has a series of seizures. (Tr. 880-81, 376, 385, 389-91). Therefore, Londo contends that, while he may not meet Listing 11.03, he medically *equals* the requirements of the listing.

Listing 11.03, as defined by the regulations, requires the following:

**11.03 Epilepsy--**nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; *occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).

It is well settled that for an impairment to *meet* a listing it must be *exactly* as specified in Appendix 1, that is, it must satisfy *all* criteria in the listing. See 20 C.F.R. §404.1525. After review of the record in the instant case, it is clear that Londo does not meet the requirements of Listing 11.03, inasmuch as he does not have documented medical evidence of seizure activity occurring more than once per week.

As stated, Londo argues that he *medically equals* the requirements of Listing 11.03. The Regulations define medical equivalence as follows:

(a) What is medical equivalence? Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.

(b) How do we determine medical equivalence? We can find medical equivalence in three ways.
   (1)(i) If you have an impairment that is described in appendix 1, but--
      (A) You do not exhibit one or more of the findings specified in the particular listing, or
      (B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
   (ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

[. . .]

20 C.F.R. § 404.1526.

Thus, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) citing 20 C.F.R. § 416.926(a) (2005) (providing that a claimant's impairment is equivalent to a listed impairment "if the medical findings are at least equal in severity" to the medical criteria for "the listed impairment most like [the claimant's] impairment").

Londo argues that, because he occasionally has a *series* of seizures, he medically equals the listing. This argument is not persuasive. In order to medically equal Listing 11.03, Londo must show medical findings *equal in severity to all the criteria* for Listing 11.03. Here, the evidence shows that Londo averages one to three seizures *per month.* (Tr. 295-96). Furthermore, Londo fails to present evidence of the remaining requirements of Listing 11.03, that is, alteration of awareness, loss of consciousness, transient postictal manifestations of unconventional behavior, or significant interference with activity during the day. In fact, Londo himself reported to Dr. Canterbury that he is able to perform most of his activities of daily living. (Tr. 834). All that Londo presents is evidence that he occasionally evidences a serial seizure pattern. The undersigned concludes that the aforementioned evidence does not medically equal Listing 11.03. Considering the foregoing, the undersigned concludes that the ALJ's conclusion that Londo does not meet or medically equal the requirements of Listing 11.03 is supported by substantial evidence.

## III.  Residual Functional Capacity

Londo also contends that the ALJ erred in assessing his residual functional capacity.  The ALJ concluded that Londo has the RFC for a significant range of light work, including the jobs of waiter, bartender, housekeeper, distribution clerk, weigher, measurer, checker, stock and inventory clerk, mail clerk, office machine operator, library clerk, and news vendor.  (Tr. 645).  In so concluding, the ALJ found that Londo has been noncompliant with his treatment regime, inasmuch as he fails to take his anti-seizure mediation as prescribed him and continues to drink alcohol despite being told to not drink by treating physicians.  The ALJ noted:

> The claimant continues to drink alcohol which is clearly not recommended when taking anti-seizure medication.  The fact that the claimant drinks alcohol and takes his medication irregularly is enough in itself to explain his continuing problems with seizures.  In order to receive benefits, the claimant must follow treatment prescribed by his doctor if this treatment can restore his ability to work.  Upon failure to follow the prescribed treatment, benefits payments may be stopped, or in this case, not started.  The record clearly documents the fact that the claimant does not regularly take his medication, and there is nothing to indicate that if he took his medication as prescribed that he would be left with any residual problems. The claimant's wife testified at the hearing that he still drinks about 3 or 4 beers per week.

(Tr. 643-44).

Generally, failure to adhere to prescribed medical treatment militates against a finding of disability.  Gonzalez v. Apfel, 1998 WL 470509, *5 (S.D.N.Y.1998), *citing* Dumas v. Schweiker, 712 F.2d 1545, 1553 (2nd Cir.1983).  However, the Commissioner cannot deny SSI disability benefits on the basis of noncompliance with treatment unless it is shown that compliance would restore a claimant's ability to work.  See, e.g., Lucas v. Sullivan, 918 F.2d 1567, 1572 (11th Cir. 1990) (finding that ALJ's conclusion that claimant's acknowledged intermittent noncompliance with seizure medication regime was primary cause of her seizures was in error, where ALJ noted himself that there was no indication in record as to whether sub-therapeutic drug levels were

caused by idiosyncrasy in absorption or metabolism of drugs; case remanded for further findings). See also Steele v. Barnhart, 290 F.3d 936 (7th Cir. 2002) (court held that ALJ's failure to address the effect of the claimant's alleged noncompliance on the frequency of seizures was error, finding that remand was appropriate for the ALJ to determine whether there was a causal link between the noncompliance and the ongoing seizure episodes).

In Alexander v. Barnhart, 2003 WL 21418244 (N.D.Ill. 2003), the ALJ concluded that claimant Alexander's seizure disorder was caused by his alcohol abuse, and that he would have been able to do sedentary work if he stopped drinking. On appeal, the court rejected this conclusion, noting that the medical evidence in the record was ambiguous as to whether Alexander's seizure would continue in the absence of alcohol. Id. at p.12. The court noted that, though the examining doctors reported that Alexander had seizures and abused alcohol, no doctor had reported any definitive link between the two, and one doctor even suggested that the seizures would continue even if Alexander stopped drinking. Id. The court also noted that Alexander had been prescribed two different kinds of anti-convulsant medications to control his seizures. Finally, the court noted that no doctor had actually stated that Alexander's seizures would be predictable and controlled by medication if he stopped drinking. Id. Citing Sarchet v. Chater, 78, F.3d 305, 307 (7th Cir. 1996), the court noted that the ALJ must "build an accurate and logical bridge between the evidence and the result," and that the ALJ had not done so in this case.

Although the undersigned was unable to find an analogous case in the Fifth Circuit, the reasoning of the Third Circuit in Brown v. Bowen, 845 F.2d 1211, 1214 (3rd Cir.1988) is persuasive. In Brown, the court stated that the criteria for epilepsy apply "only if the impairment persists *despite the fact that the individual is following prescribed anticonvulsive treatment.*"

(emphasis added). Therefore, the court in <u>Brown</u> determined that a threshold issue was "whether [Plaintiff] has met the preliminary requirement of 20 C.F.R. 404, subpt. P, app. 1 §11.00 that he demonstrate compliance with prescribed anticonvulsive treatment." <u>Brown</u>, 845 F.2d at 1215. The <u>Brown</u> court further noted that whether an applicant is adhering to his prescribed anticonvulsive therapy "can ordinarily be determined from objective clinical findings. . . Determination of blood levels of [Dilantin] or other anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken." <u>Id.</u> at 1214.

It is clear that Londo's testimony that he no longer abuses alcohol and takes his medication as directed is not credible. The record is replete with evidence that most of Londo's seizures occur after instances in which he has either ingested alcohol, taken too little medication, or taken too much medication. Furthermore, the undersigned concludes that, unlike the factual scenario in <u>Alexander</u>, the ALJ in the instant case has "buil[t] a logical bridge" between Londo's seizure disorder and his drinking and/or failure to take his medication as prescribed. As in <u>Brown</u>, the evidence of noncompliance with a treatment regime – including failure to take medication as prescribed and drinking alcohol – is overwhelming. Furthermore, no doctors who have examined or treated Londo have suggested that Londo is experiencing seizures because of an improper absorption or metabolism of anti-seizure medication.

Finally, Londo's contention that he does not take his medication as prescribed because he cannot afford it is without merit. The record shows that Londo smokes cigarettes every day and drinks alcohol on a regular basis. The Fifth Circuit has held that for a claimant who cannot afford prescribed treatment or medicine, *and can find no way to obtain it*, "the condition that is disabling in fact continues to be disabling in law." <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir.

1987).  See also Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.1999) (claimant's statement that he could not afford medications was contradicted by lack of evidence that he "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication"); Schneiders v. Barnhart, 2006 WL 559247, *13 (N.D.Iowa 2006) (where claimant went for long period of time without seeking treatment at all, refused some recommended treatment, failed to take his medications as prescribed, court found support for ALJ's determination that claimant's subjective complaints were not fully credible); Jacobs v. Chater, 956 F.Supp. 1560, 1567-68 (D.Colo.1997) (inability to pay for treatment does not necessarily preclude an ALJ from considering the failure to seek medical attention in credibility determinations, especially where the claimant could apparently afford beer and cigarettes).

Here, the undersigned concludes that Londo fails to show that he can find no way to obtain medication that would alleviate his seizure disorder.  In so finding, the undersigned concludes that, if Londo can afford his alcohol and cigarette habit, he can afford medication.

For the foregoing reasons, the undersigned concludes that the ALJ's RFC assessment is supported by substantial evidence.

*Conclusion*

Considering the foregoing, it is **RECOMMENDED** that the decision of the ALJ be **AFFIRMED.**

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, <u>Richard v. Sullivan</u>, 955 F.2d 354 (5th Cir. 1992) and <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within ten (10) days from the date of its service, or within the time frame authorized by Fed.R.Civ. P. 6(b), shall bar an aggrieved party from attacking the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on June 26, 2006.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)